

ORDERED in the Southern District of Florida on July 2, 2024.



**Erik P. Kimball
Chief United States Bankruptcy Judge**

___

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

| | |
|---|---|
| In re: | CASE NO.: 20-22497-EPK |
| STUART ROY MILLER, | CHAPTER 7 |
|     Debtor. | |
| _____/ | |
| MICHAEL R. BAKST, as Chapter 7 Trustee in Bankruptcy for Stuart Roy Miller, | |
|     Plaintiff, | |
| v. | ADV. PROC. NO.: 22-01427-EPK |
| JRS HEALTH SERVICES, LLC, *et al.*, | |
|     Defendants. | |
| _____/ | |

**ORDER GRANTING IN PART MOTION FOR SUMMARY JUDGMENT**

The plaintiff in this adversary proceeding is Michael R. Bakst, as chapter 7 trustee (the "Trustee") in bankruptcy for the debtor, Stuart Roy Miller. In the *Motion for Summary Judgment Against Bedrock Group, LLC on Counts XV, XVII, and XVIII of the Amended Adversary Complaint, or in the Alternative, for Entry of an Order Treating Certain Material Facts as Established in the Case* [ECF No. 126] (the "Motion"), the Trustee seeks summary

judgment on three of the eighteen counts in his *Amended Complaint* [ECF No. 83]. In the alternative, the Trustee asks the Court to enter an order treating certain material facts as established in this adversary proceeding. The three counts at issue—Counts XV, XVII, and XVIII—all seek avoidance of fraudulent transfers based on constructive fraud under either Bankruptcy Code section[1] 548 or section 544 incorporating Florida Statutes. For the reasons that follow, the Court grants in part the Motion, to the extent it requests that certain material facts be treated as established.

## Factual and Procedural Background

The debtor filed his bankruptcy petition on November 13, 2020. The assets and liabilities of JRS Health Services, LLC ("JRS"), an entity formed on April 15, 2020, have been substantively consolidated with and merged into the bankruptcy estate of the debtor, Stuart Roy Miller, "creating one consolidated estate of assets and liabilities for all purposes, effective as of Stuart Roy Miller's Petition Date of November 13 2020." Main Case ECF No. 355 at ¶ 4. As such, transfers from and obligations incurred by JRS, whether before or after entry of the substantive consolidation order, are treated as transfers from and obligations incurred by the debtor.[2]

Before the debtor filed his bankruptcy petition, on May 22, 2020, Office Depot, LLC and JRS entered into a Trade Vendor Purchasing Agreement and an initial addendum thereto for Office Depot to purchase personal protective facemasks from JRS. On August 26, 2020, Office Depot and JRS entered into another addendum to the Trade Vendor Purchasing Agreement whereby Office Depot agreed to purchase from JRS twenty-four million boxes of

---

[1] Unless otherwise indicated, the term "section" or "sections" refers to the given section or sections of the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq*.
[2] All of the transfers at issue in this adversary proceeding took place prior to entry of the substantive consolidation order. Although they are considered transfers by the debtor for purposes of the Court's analysis here, they are referred to as transfers of JRS to avoid confusion.

Intco or Hartelega personal protective gloves. Of the agreements between JRS and Office Depot, the glove addendum is most at issue in this case.

A few days before the debtor and Office Depot entered into the glove addendum, on August 20, 2020, JRS and defendant Bedrock Group, LLC ("Bedrock") entered into a Sale and Purchase Agreement (the "Bedrock Purchase Agreement"). The Bedrock Purchase Agreement provided, among other terms, that JRS would purchase from Bedrock twelve million boxes of Intco or Hartelega personal protective gloves or another brand of similar specifications delivered over a period of six months at the rate of two million boxes per month, and that JRS would pay Bedrock $12,000,000 in the form of two irrevocable, non-refundable deposits. The Bedrock Purchase Agreement does not explicitly require Bedrock to return any deposit to JRS under any conditions.

On September 1, 2020, Office Depot wired $10,500,000 to JRS. The next day, on September 2, 2020, JRS wired $10,350,000 from its bank account to Bedrock.

The Trustee seeks to avoid as constructively fraudulent two transfers from JRS to Bedrock: (1) the obligation to pay the deposits pursuant to the Bedrock Purchase Agreement and (2) the transfer of $10,350,000 from JRS's bank account to Bedrock.

Bedrock never delivered any personal protective gloves to JRS. Nor did Bedrock refund any of the $10,350,000 deposit to JRS.[3] Bedrock used $2.7 million of the $10,350,000 it received from JRS to pay FCO Genesis, which apparently was in the business of supplying Hartelega gloves.

Bedrock subsequently paid at least $150,000 to counsel representing JRS in connection with a state court lawsuit brought by Office Depot against JRS and Bedrock. While this is not disputed, any such payment was not value provided under the Bedrock

---

[3] While Bedrock refunded $1.2 million to JRS in connection with an earlier transaction, that refund has no impact on the Court's ruling here.

Purchase Agreement and has no bearing on the present dispute.

The Trustee's forensic accounting expert determined that Stuart Roy Miller and JRS, on a combined basis, were insolvent on April 15, 2020 (when JRS was formed) and remained insolvent from that date through November 13, 2020 (the petition date). This means the debtor was insolvent in August, 2020 and September, 2020, when the two allegedly fraudulent transfers occurred. During that same period of time, the debtor was inadequately capitalized, because the debtor was engaged in a business and transactions for which it had an unreasonably small amount of capital.

**Summary Judgment Standard**

Federal Rule of Civil Procedure 56(a), made applicable to this matter by Federal Rule of Bankruptcy Procedure 7056, provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). "An issue of fact is 'material' if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997). In considering a motion for summary judgment, the Court must construe all facts and draw all reasonable inferences in the light most favorable to the non-moving party. *Id.*

The moving party has the burden of establishing that there is an absence of any genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the moving party meets that burden, the burden shifts to the non-movant, who must present specific facts showing that there exists a genuine dispute of material fact. *Walker v. Darby*, 911 F.2d 1573, 1576 (11th Cir. 1990) (citation omitted). "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably

find for that party." *Id.* at 1577 (citing *Anderson*, 477 U.S. at 252).

At the summary judgment stage, the Court will not weigh the evidence or find facts; rather, the Court determines only whether there is sufficient evidence upon which a reasonable juror could find for the non-moving party. *Morrison v. Amway Corp.*, 323 F.3d 920, 924 (11th Cir. 2003).

**Analysis**

The Trustee seeks summary judgment on Count XV, Count XVII, and Count XVIII of the amended complaint. All three counts seek the avoidance and recovery of fraudulent transfers from Bedrock: Count XV pursuant to sections 548(a)(1)(B) and 550, Count XVII pursuant to sections 544 and 550 and Fla. Stat. § 726.105(1)(b), and Count XVIII pursuant to sections 544 and 550 and Fla. Stat. § 726.106(1). For all three counts, the Trustee may avoid a transfer of an interest of the debtor or an obligation incurred by the debtor if the debtor did not receive reasonably equivalent value in exchange and one of the following, depending on the statute, was true: the debtor was insolvent when the transaction occurred or became insolvent as a result of the transaction, or the debtor was engaged in business or a transaction or about to engage in a business or transaction for which the debtor was left with unreasonably small capital.[4] Bedrock disputes only two aspects of the claims in these three counts—whether the transfers were of an interest of the debtor's own property and whether the debtor received reasonably equivalent value in exchange for the transfers—and so the Court focuses on those two elements.

*Property of the Debtor*

The transfer made must have been of an interest of the debtor in property. Bedrock

---

[4] Of the two counts that rely on Florida law, one requires the existence of a present or future creditor at the time of the transaction while the other requires the existence of a present creditor to state a claim. In this case, it is undisputed that there is an entity that holds a claim that arose before the two transfers the Trustee seeks to avoid and so both statutes are satisfied to that extent.

argues that the $10.35 million sent by JRS to Bedrock was not property of JRS, and thus not property of the debtor, because JRS was acting as a mere conduit of those funds, which had come from Office Depot the day before.

      The "mere conduit or control test" is an exception "grounded in the equitable powers of the bankruptcy court" that seeks to avoid the possibility that a "literal or rigid interpretation" of the fraudulent transfer statutes may lead to an inequitable result. *Menotte v. United States (In re Custom Contractors, LLC)*, 745 F.3d 1342, 1349-1350 (11th Cir. 2014). The test is "a flexible, pragmatic, equitable approach of looking beyond the particular transfer in question to the circumstances of the transaction in its entirety." *Martinez v. Hutton (In re Harwell)*, 628 F.3d 1312, 1322 (11th Cir. 2010). The mere conduit or control test applies both when a defendant argues that a transferor lacked control over funds transferred, and thus did not own the funds, and when a defendant argues that a recipient lacked control over funds received, and thus should not be considered a transferee of a fraudulent transfer. *Id.* at 1349 n.5. In this case, Bedrock argues that JRS (the transferor) lacked control over the funds it received from Office Depot and subsequently sent to Bedrock.

      Immediately prior to the $10.35 million payment by JRS to Bedrock, those funds were in a bank account owned by JRS. "[F]unds in a debtor's account are generally presumed to be the debtor's property." *In re Int'l Pharmacy & Disc. II, Inc.*, 443 F.3d 767, 771 (11th Cir. 2005). In opposition to this presumption, Bedrock offers the declaration of Jonathan Roth, its manager who was involved in the transactions at issue. Mr. Roth states that the parties to the Bedrock Purchase Agreement understood that Office Depot had or would be ordering a certain number of boxes of gloves from JRS, which was brokering or acting as a "middleman" for the transaction, while Bedrock was obligated to acquire the gloves from its own or JRS's suppliers, that Office Depot was aware of and consented to this arrangement between JRS and Bedrock, that Office Depot was aware that its purchase order payment, net

of JRS's commission, would immediately be paid to Bedrock to fill the order, and that JRS transferred the net amount (less JRS's profit from the deal of $150,000) to Bedrock one day after JRS received funds from Office Depot.  Mr. Roth believed that all three parties to the glove purchase/sale transaction understood that JRS was using Bedrock to purchase and finance the unfunded portion of the purchases of the Office Depot purchase order and that JRS had an obligation to pay the Office Depot funds over to Bedrock, which JRS did pay immediately upon receipt of funds from Office Depot.

The evidence before the Court here does not support the conclusion that JRS was a mere conduit under applicable law.  JRS entered into two entirely separate contracts.  JRS agreed to buy gloves from Bedrock.  JRS agreed to sell gloves to Office Depot.  There is nothing in JRS's agreement with Office Depot that required JRS to acquire the gloves from Bedrock or any other specific vendor.  Nor was there any agreement that JRS pay any sum it received from Office Depot to Bedrock or any other supplier.  JRS's obligations to Office Depot were independent of its obligations to Bedrock.

Mr. Roth's "belief" that JRS, Office Depot, and Bedrock all "understood" JRS would pay over to Bedrock most of the funds received from Office Depot is entitled to no weight here for two reasons.  First, Mr. Roth cannot possibly testify as to what JRS and Office Depot had agreed to or required from each other.  Mr. Roth is not an officer or agent of either party.  He does not even purport to have personal knowledge on behalf of JRS or Office Depot.  Second, even if all three parties understood that JRS was acting as a "middle-man" and that JRS would need to pay most of what it received from Office Depot to Bedrock to facilitate the transaction, this does not make JRS a conduit under applicable law.  If that was the case, every middle-man and arbitrageur would be a conduit for purposes of fraudulent transfer analysis.

Based on the evidence before the Court here, JRS had an obligation to pay Bedrock

completely separate from Office Depot's obligation to pay JRS. That JRS transferred funds to Bedrock the day after it received payment from Office Depot is evidence only of JRS's intent to comply with its agreement with Office Depot, by arranging to acquire product to permit JRS to meet its delivery obligation to Office Depot, as well as perform under JRS's completely separate agreement with Bedrock, by making a required payment. Other than Mr. Roth's declaration, which is not supported by personal knowledge of any binding agreement of JRS and Office Depot, there is no evidence to suggest that Office Depot in any way restricted JRS's control over the transferred funds or directed where the funds should go or how they should be used. Saying that Office Depot was aware of what JRS intended to do with the funds is very different from establishing that it was Office Depot—and not JRS—actually in control of the funds. Bedrock has not demonstrated a genuine dispute of material fact as to whether the funds transferred were property of the debtor.

*Reasonably Equivalent Value*

The Trustee argues that the debtor did not receive reasonably equivalent value in exchange for the transfers. Specifically, the Trustee argues that the Bedrock Purchase Agreement was a textbook illusory contract because it did not obligate Bedrock to provide gloves to JRS but did obligate JRS to make non-refundable, irrevocable deposits to Bedrock totaling $12 million. The Trustee argues that both Mr. Roth's declaration and the Trustee's own forensic accounting expert's report show that JRS received a relatively small sum in legal fees from Bedrock, and that JRS never received any gloves.

The Trustee argues that the Bedrock Purchase Agreement merely sets forth quantity and pricing terms but does not explicitly require Bedrock to supply the gloves to JRS. While the Bedrock Purchase Agreement also provides that JRS may reject, refuse, or decline any non-conforming products, it does not provide that JRS is ever entitled to a refund of its $12 million deposits, even if Bedrock fails to deliver conforming products. Further, the Trustee

points to a provision in the Bedrock Purchase Agreement that permits Bedrock but not JRS to assign the agreement.

First, whether JRS actually received any gloves from Bedrock consistent with the written agreement, in hindsight, is not relevant to the Court's analysis. To determine whether the debtor received reasonably equivalent value, the Court looks to the transaction at the time the transfer was made, without regard to what property was actually received thereafter. *Butler Aviation Int'l v. Whyte (In re Fairchild Aircraft Corp.)*, 6 F.3d 1119, 1126-1127 (5th Cir. 1993).

Second, based on the record currently before the Court, the Bedrock Purchase Agreement is not an illusory or sham agreement. The introductory language in the agreement states that Bedrock intends to sell gloves and recognizes the very terms the Trustee points to as constituting good and valuable consideration. Paragraph 3 of the agreement requires Bedrock to deliver the products to JRS in more than one discrete shipment, each subject to inspection as provided in the agreement. Paragraph 4 requires Bedrock, after receiving a deposit and agreed delivery date, to provide a pre-shipment inspection report, which JRS could accept, and after which JRS had to wire to Bedrock the purchase price for the first shipment. That paragraph goes on to say that "[Bedrock] shall commence completion of the fulfillment of the Purchase Order ("Order Commencement") upon receipt of [JRS's] funds." This process was to be repeated for each individual shipment of gloves. Paragraph 5 of the agreement provides that Bedrock will arrange an inspection of the gloves prior to each shipment, that a satisfactory report from the inspection fulfills any JRS requirements for "proof of life" of the products to be delivered, and that JRS may reject, refuse to purchase, and decline delivery of any products that do not meet certain specifications. In other words, based on the evidence before the Court, the Bedrock Purchase Agreement is a fully enforceable agreement, binding on both JRS and Bedrock. Contrary to

the Trustee's argument, the agreement required Bedrock to deliver gloves, even if it does not contain an explicit phrase such as "Seller shall deliver". Bedrock's promise to deliver gloves constitutes reasonably equivalent value for JRS's promise to make payments to Bedrock.

Based upon this record, it is not appropriate to grant summary judgment in favor of the Trustee on the issue of lack of reasonably equivalent value with regard to the obligations incurred in the Bedrock Purchase Agreement or the funds transferred by JRS to Bedrock.

The Trustee also points to the minimal value he says JRS actually received—about $150,000 in legal fees. The Trustee argues that the payments to counsel were not intended to benefit JRS but only to use JRS as a shield to protect Bedrock from liability and, even if those payments benefited JRS, those payments were not reasonably equivalent to the $12 million obligation or the $10,350,000 actually paid. Even if the legal fee payments benefited JRS, the Trustee argues, JRS did not receive reasonably equivalent value.

But this is not really the issue. Again, the Court looks to what the debtor bargained for and received at the time of each transfer, not what the debtor received at a later time. Under the Bedrock Purchase Agreement, JRS incurred an obligation to pay funds, and actually made a payment, in exchange for a specified number of gloves. Both the Bedrock Purchase Agreement itself and the payment actually made were supported by value.

The Trustee also points to what Bedrock actually did with the funds it received from JRS. But what Bedrock did with those funds says nothing about what value JRS received from the Bedrock Purchase Agreement and its $10.35 million transfer pursuant thereto. There is an apparently enforceable contract, with promises on both sides.

Finally, the Trustee suggests that from the start Bedrock never intended to perform under the Bedrock Purchase Agreement. But, on the record before the Court, there is no evidence to support that JRS was induced to enter into the Bedrock Purchase Agreement by fraud.

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1. The *Motion for Summary Judgment Against Bedrock Group, LLC on Counts XV, XVII, and XVIII of the Amended Adversary Complaint, or in the Alternative, for Entry of an Order Treating Certain Material Facts as Established in the Case* [ECF No. 126] is GRANTED IN PART as provided herein.

2. Summary judgment on Counts XV, XVII, and XVIII of the amended complaint is DENIED.

3. The following facts will be treated as established in this case:

    (a) The assets and liabilities of JRS Health Services, LLC ("JRS") have been substantively consolidated with and merged into the bankruptcy estate of Stuart Roy Miller, creating one consolidated estate of assets and liabilities for all purposes, effective as of Stuart Roy Miller's petition date of November 13, 2020. All transfers of assets by JRS, and all obligations incurred by JRS, will be treated as transfers by and obligations incurred by the debtor.

    (b) On May 22, 2020, Office Depot, LLC and JRS entered into a Trade Vendor Purchasing Agreement and an initial addendum thereto for Office Depot to purchase personal protective facemasks from JRS.

    (c) On August 26, 2020, Office Depot and JRS entered into an addendum to the Trade Vendor Purchasing Agreement whereby Office Depot agreed to purchase from JRS twenty-four million boxes of Intco or Hartelega personal protective gloves.

    (d) On August 20, 2020, JRS and Bedrock Group, LLC ("Bedrock") entered into a Sale and Purchase Agreement.

    (e) Under the Sale and Purchase Agreement, JRS agreed to purchase from Bedrock, and Bedrock agreed to sell to JRS, twelve million boxes of Intco or Hartelega personal protective gloves or another brand of similar specifications delivered over a period

of six months at the rate of two million boxes per month. JRS agreed to pay Bedrock $12,000,000 in the form of two irrevocable, non-refundable deposits.

(f) On September 1, 2020, Office Depot wired $10,500,000 to JRS for payment under the August 26, 2020 addendum to the Trade Vendor Purchasing Agreement.

(g) On September 2, 2020, JRS wired $10,350,000 from its bank account to Bedrock for payment under the Sale and Purchase Agreement.

(h) The $10,350,000 transferred from JRS to Bedrock was property of JRS and thus property of the debtor at the time of the transfer.

(i) Bedrock never provided any personal protective gloves to JRS.

(j) Bedrock never refunded any of the $10,350,000 to JRS.

(k) The Sale and Purchase Agreement did not explicitly require Bedrock to return any deposit to JRS.

(l) Bedrock subsequently paid at least $150,000 to counsel representing JRS in connection with a state court lawsuit Office Depot brought against Bedrock and JRS.

(m) There exists an entity with a claim against this bankruptcy estate that arose before the transfers occurred.

(n) The debtor was insolvent when the transfers occurred or became insolvent as a result of the transfers.

(o) At the time of each transfer, the debtor was engaged in business or a transaction or about to engage in a business or transaction for which the debtor was left with unreasonably small capital.

###

Copies Furnished To:
Michael R. Bakst, Esq.

*Michael R. Bakst, Esq. is directed to serve a conformed copy of this Order on all appropriate parties and file a certificate of service.*